**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**BROWARD DIVISION**

**CASE NO.: 20-CV- 62094 -XXXX**

**RIAN KINNEY,**

    **Plaintiff,**

vs.

**MINDSIZE, LLC,**

    **Defendant.**

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, RIAN KINNEY ("Plaintiff") in the above styled cause hereby sues Defendant, MINDSIZE, LLC, a foreign limited liability company ("Defendant" or "the Company") and hereby files and serves her Complaint and Demand For Jury Trial and alleges:

**NATURE OF THE SUIT**

1. Plaintiff brings this action to recover damages against Defendant for alleged gender discrimination and retaliation and under the Equal Pay Act of 1963 ("EPA"), 52 Stat. 1062, as amended, 29 U.S.C. §206(d) *et seq*. and for substantial and related claims for gender wage discrimination, retaliation, and breach of contract under the state and common laws of the State of Florida, all arising from Defendant's unlawful actions.

**PARTIES, JURISDICTION, AND VENUE**

2. Plaintiff is female, at all relevant times an "employee" of MINDSIZE as defined by the EPA and the Fair Labor Standards Act (FLSA), and is a resident of Broward County, Florida.

3. MINDSIZE, a Delaware Limited Liability Company, advertises, operates, engages in continuous business, and employed Plaintiff, within this judicial district at all relevant times.

4. At all relevant times, MINDSIZE was an "employer" within the meaning of the EPA and the Fair Labor Standards Act (FLSA).

5. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§451, 1331, 1337, 1343, & 1345, the Equal Pay Act of 1963 ("EPA"), 52 Stat. 1062, as amended, 29 U.S.C. §206(d) *et seq.*,

6. Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. §1391(b), wherein MINDSIZE regularly advertises and conducts business and where the actions giving rise to this lawsuit occurred in Broward County, Florida.

7. This Complaint seeks damages in excess of One Hundred Thousand Dollars ($100,000.00)

8. Plaintiff has complied with all statutory prerequisites and conditions precedent to filing this action.

## GENERAL ALLEGATIONS

9. Plaintiff has been a licensed Florida attorney since 2009, serves as the Vice-Chair for the American Bar Association's Open Source Software Committee, earned the International Association of Privacy Professionals' CIPP/E and CIPM designations, teaches technology and privacy ethics CLE's for attorneys, and is a national and international speaker on tech contracts and privacy issues.

10. Defendant hired Plaintiff as Director of Operations and General Counsel in August 2019, to work from home in Broward County.

11. Plaintiff was the first and only female employee, since the Company's formation in 2017 (that was not a significant other of a Member of the Company)

12. In the beginning of 2020, Plaintiff became instrumental in assisting Chief Technical Officer, Patrick Garman, in acquiring sole ownership and securing the financial

security of the Company and assisting Defendant with the tumultuous exit of Mindsize's first CEO and Plaintiff's predecessor, Zach Stepek ("Mr. Stepek).

13. Plaintiff referred Mr. Garman to Aegis Law, a firm she had an ongoing referral relationship with and had done business with prior to the Mr. Stepek's withdrawal to represent Mr. Garman's personal interests.

14. Plaintiff, in her capacity as General Counsel for Defendant, worked with Aegis Law to negotiate the former CEO's settlement and severance.

15. During the uncertainty in March 2020, regarding whether Mr. Stepek would or would not continue on as CEO, Plaintiff informed Patrick Garman ("Mr. Garman") that she was seeking employment elsewhere and interviews were being scheduled.

16. Mr. Garman expressed his desire for Plaintiff to stop interviewing for legal positions, he wished her to remain with Mindsize and assume Zach Stepek's duties, upon his departure.

17. Prior to Mr. Stepek's exit, Defendant, by and through Mr. Garman, agreed that Plaintiff would be named CEO of Mindsize and CEO related duties would transfer to her in exchange for: 1) $130,000.00 base salary, 2) Defendant's completion of Plaintiff's eCommerce website (started in February and Defendant was aware that competing firm quoted $25,000.00 to complete the first phase of the project), and a 3) performance bonus to be negotiated by the parties after Mr. Stepek's exit was finalized and the Company was stable.

18. Relying on this agreement between the Parties, Plaintiff publicly wound down her law practice with the expectation that her salary would be commensurate with her new title and duties.

19. On April 17, 2020, Defendant publicly announced Plaintiff as the new CEO of Mindsize on its website.

20. Plaintiff created a job description for the CEO position.

21. The CEO job description included the major responsibilities previously held by former CEO, Mr. Stepek, as well as, the legal and General Counsel responsibilities that Ms. Kinney had been performing as Director of Operations and General Counsel for the 8 months prior to assuming the CEO position. (Thereby consolidating the responsibilities Defendant previously employed two individuals to perform, and paid them a combined salary of $285,000.00).

22. During the scope of Plaintiff's employment Defendant never revised this CEO job description.

23. On June 30, 2020, Defendant further expanded Plaintiff's CEO role and responsibilities to include managing the Director of Engineering and Project Manager, responsibilities not performed by the former CEO.

24. At all times prior to requesting equal pay, Patrick Garman and his wife, Cassie Garman ("Mrs. Garman"), repeatedly complimented Plaintiff's work, commented on her performance exceeding the former CEO's, and did not criticize or otherwise express a need for her performance to improve.



25. Once Plaintiff was acting CEO, her work responsibilities exceeded the work responsibilities of the former CEO, and she was being paid thirty-five (35%) less than male CEO's employed by Defendant.

26. After 90 days, Plaintiff performed pursuant to the terms of the parties' agreement but Defendant had not. Namely, since Ms. Kinney began performing the responsibilities of

CEO, Patrick Garman briefly discussed wanting to architect and develop a custom form solution for Plaintiff's website rather than install a commercially available system but no time was actually invested to architect such a solution, nor was any development work performed or scheduled to be performed, nor had the Defendant proposed or discussed a bonus structure that would fairly compensate Plaintiff.

27. On July 17, 2020, in light of Defendant's failure to perform web development services and compensate Plaintiff as previously agreed, Defendant's expansion of the Plaintiff's CEO responsibilities, as well as praise received from Patrick Garman and Cassie Garman for performance over the first 90 days, Ms. Kinney asked Defendant for her salary to be raised to $200,000.00, equal to the former (male) CEO's and proposed a performance bonus.

28. The Defendant, by and through Patrick Garman, stated he would think about it, he needed to "look at spreadsheets" and get back to her, with no stated timeline.

29. Public support, internally and externally, for Ms. Kinney and her role as CEO, by Patrick Garman and Cassie Garman ceased on July 17, 2020.

30. After requesting equal pay, Patrick Garman and Mrs. Garman provided conflicting information for why Patrick Garman refused to acknowledge or respond to Ms. Kinney's attempts to obtain a timeline, status updates, or further the discussion over the next two weeks, including but not limited to, he "wasn't doing any work on the weekends" and was "too busy."

31. On July 30th, the Doo the Woo Podcast, "From Attorney to CEO of an eCommerce Agency" with Plaintiff as the featured guest, was published. Plaintiff again restated publicly that Kinney Firm was not taking on new clients, that her position as Defendant's CEO was her primary focus.

32. On July 31st, after two weeks of Defendant refusing to provide any information other than he was busy, Patrick Garman cancelled a regularly scheduled Friday meeting between the parties to reschedule for the following Monday, and Plaintiff asked Defendant if he was considering firing her.

33. The same day, Mrs. Garman texted Plaintiff to call her.

34. Mrs. Garman started the call by stating "they were happy with Plaintiff's work and weren't thinking about firing her", but that her request for equal pay was "outrageous", a word she used another 3 times in the call, they didn't feel employees should "get rich off the company", and Patrick is able to see it as just business but she "takes it personal."

35. On August 3, 2020, 30 minutes ahead of the scheduled meeting, Defendant by and through Patrick Garman, e-mailed Plaintiff, "Our Offer."

36. Defendant's written offer did not provide equal pay for equal work but would reduce the pay gap from 35% to 20% and included criticism that had never been expressed in any of the 2-3 meetings a week the parties had together for the previous twelve (12) weeks, as well as blatant misstatements of fact, claims of "incomplete" projects where Patrick Garman had already acknowledged (in writing) that he was solely responsible for, mischaracterizations of previous discussions and understandings, material reframing of the terms and conditions of her employment and the insinuation that Ms. Kinney was not putting the Company first by asking for and following up on her request for equal pay and a written employment contract (after 90 days in the position), while simultaneously acknowledging, Defendant was paying her (as CEO and General Counsel) below the average salary for CEO's of similarly sized and aged companies.

37. Prior to entering time off on August 3, 2020, Plaintiff had not taken any of the 10 paid vacation days that accrued on January 1, 2020 and had previously taken one sick day in 2020.

38. Defendant scrutinized and denied Plaintiff time off, citing terms set forth in the Employee Handbook Plaintiff drafted and stating she failed to provide a "Gap Plan".

39. Prior to her request for equal pay, as a member of the Executive team (in both her roles as Director of Operations and CEO), Plaintiff would inform Defendant of time she would be out for speaking engagements, volunteer events, business related travel, and would sometimes not enter a time off "request" or would enter it after the scheduled event, without reprimand or discussion.

40. Prior to her request for equal pay, Defendant never required, nor had Plaintiff ever provided, a "gap plan"; nor was a gap plan a stated requirement in any executive policy.

41. Defendant only allowed Plaintiff time off after she explained the medical nature behind her request but continued to state his desire to document the "questionable" timeline.

42. Plaintiff learned Defendant hired Mrs. Garman as Operations Manager on August 4, 2020 from Slack notifications received while in the Emergency Room on August 5, 2020.

43. Prior to Plaintiff asking for equal pay, Defendant previously asked if Plaintiff had any objection to Mrs. Garman joining as an Operations Assistant at $42,000.00.

44. In the three days Plaintiff was out sick, Defendant added Mrs. Garman to the executive team, as an Operations Manager with no stated job description, for $22,000.00 higher than previously discussed.

45. Prior to her request for equal pay, Plaintiff had been the head of Operations for almost a year, Defendant now had the Operations Manager reporting to Mr. Garman instead of the CEO and there no one in the Operations Department for Mrs. Garman to "manage" other than the Plaintiff.

46. In fear for her job, and against medical advice, Plaintiff returned to work on August 6, 2020.

47. The Defendant did not update the timeline or HR documentation to reflect that medical documentation was provided, Plaintiff returned to work against doctor's orders, taking only 3 of the initially refused days off.

48. On August 14, 2020, during the regularly scheduled C-Team meeting, Plaintiff asked Patrick Garman what the status of the employment contract was and what the next steps were. Mr. Garman stated that he had been "too busy with accountants that week", implying that the contract would be forthcoming.

49. Plaintiff was tasked with human resources duties and other operational functions as CEO.  These responsibilities required her to be informed of company decisions, specifically the hiring of an Operations Manager.

50. Following Mrs. Garman's hiring, Defendant removed certain responsibilities from Plaintiff without any discussion with her and without any revision to her job description.

51. At all times from the Operation Manager's 8/4/2020 date of hire through the 8/27/2020 date of termination, Cassie Garman, refused to meet with Plaintiff to discuss the role or job responsibilities she was performing

52. Defendant began cutting Plaintiff out of important communications and decision-making processes.

53. Defendant also began canceling meetings that were scheduled to discuss the future of the company, restructured corporate meetings, and essentially assumed all CEO duties.

54. Defendant removed so much of Plaintiff's responsibilities, Plaintiff had to ask Mr. Garman what her duties and her responsibilities were moving forward.

55. Mr. Garman responded by informing Plaintiff that her role was essentially changing and that she would be more focused on sales and marketing.

56. Defendant's change of Plaintiff's duties and responsibilities was made without any discussion with Plaintiff and was essentially a demotion in her duties and responsibilities.

57. Three weeks after Defendant sent the written offer and two weeks after Plaintiff asked for a status update and next steps for the written employment contract incorporating the offer, on August 24, 2020, Plaintiff sent a written complaint to Defendant outlining her concerns about equal pay, retaliation, and a hostile work environment.

58. On August 26, 2020 Plaintiff was constructively discharged, Defendant restricted Plaintiff's access to company accounts.

59. Former counsel for Plaintiff contacted Defendant regarding Equal Pay Act and Retaliation claims, on August 27, 2020. Defendant responded that Plaintiff was terminated, and Patrick Garman assumed the CEO title and responsibilities the same day, at a salary of ($200,000.00) .

## COUNT 1:
## VIOLATION OF THE EQUAL PAY ACT OF 1963,
## 29 U.S.C. §206(d) - UNLAWFUL GENDER WAGE DISCRIMINATION

60. Plaintiff adopts and incorporates by reference the allegations in paragraphs 1 to 59 of this Complaint.

61. Since its formation, Defendant has operated as a fully remote, fully distributed company, with all employees working remotely.

62. Defendant's acts or omissions, through its employees and/or agents resulted in unfairly paying Plaintiff a base salary lower than male CEO's employed by Defendant in the same role, for substantially similar work with the same required skill, effort, and responsibility, violated 29 U.S.C. §§ 206(d), 215(a)(2).

63. After Defendant breached the parties initial agreement to perform web development services as part of Plaintiff's employment compensation, Defendant refused to negotiate a salary equal to Defendant's male CEO's, Defendant never actually increased Plaintiff's salary nor produced an employment contract in conformity with their original agreement or Defendant's August 3, 2020 written offer, nor was any performance bonus ever paid to Plaintiff.

64. At all times material to this action, Defendant did not have written policies regarding or otherwise state: (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex that would justify its disparate treatment of Plaintiff.

65. Defendant's unlawful actions were willful.

66. Defendant's acts or omissions resulting in its paying Plaintiff, female CEO's less than their male CEO's were neither in good faith nor did it have reasonable grounds for believing that its acts or omissions were not a violation of the EPA.

67. As a direct and proximate result of the aforementioned discriminatory acts of Defendant, through its employees and/or agents, in violation of 29 U.S.C.§§ 206(d), 215(a)(2), Defendant is liable in the amount of Twenty Four Thousand Two Hundred Thirty Dollars

($24,230.00) in back pay, plus an equal amount as liquidated damages, interest, attorney's fees and costs.

## COUNT II:
## RETALIATION IN VIOLATION OF THE EQUAL PAY ACT OF 1963, 29 U.S.C. §206(d) - UNLAWFUL GENDER WAGE DISCRIMINATION

68. Plaintiff adopts each and every factual allegation as stated in paragraphs 1-67 above as if set out in full herein.

69. This is an action to recover damages resulting from unlawful and retaliatory actions and discharge pursuant to the EPA.

70. All conditions precedent to bringing this action have occurred, been performed or been excused.

71. Plaintiff engaged in protected activity, *i.e.*, requesting to be paid equal to Defendant's male CEO's, and opposing gender discrimination, retaliation, and practices made unlawful by the EPA.

72. In response to statutorily protected activity, Defendant, through its employees and/or agents, adopted a pattern of subjecting Plaintiff to a series of retaliatory adverse employment actions, including, but not limited to, the following: scrutinizing and denying her time off request, removing supervisory responsibilities, scrutinizing work more closely than that of other employees, materially altering the terms and conditions of her employment, without discussion, and termination.

73. These reprisals were a materially adverse employment action in that such actions, whether considered individually or collectively, altered the terms, conditions or privileges of Plaintiff's employment, and/or adversely affected Plaintiff's status as an employee. Further, the

retaliatory acts were reasonably likely to deter employees from engaging in protected activity. As such, the retaliatory acts constitute adverse employment actions for the purposes of the EPA.

74. The retaliatory acts when considered collectively were sufficiently severe and/or pervasive to materially alter the conditions of Plaintiff's employment and create a hostile working environment.

75. On August 24, 2020, Plaintiff emailed Defendant to raise her concerns regarding the adverse employment actions, removal of supervisory responsibilities, and altered terms and conditions of employment without discussion.

76. Defendant made no attempt to comply with the law, to address or redress the adverse actions and instead Mr. Garman, in his August 24, 2020 email, attempted to justify his actions and stated, "I own Mindsize, I have no partner, I have no obligation to run any decision by anyone and can be as active in the company as I choose to be. Is that a problem? …"

77. On August 25, 2020, Plaintiff responded to Defendant's hostile email by outlining her specific complaints, that: she was being prevented from performing the responsibilities in the CEO job description that she was performing prior to requesting equal pay, retaliation, and hostile work environment.

78. Seeking redress, Plaintiff proposed options to remedy the situation, including, the Defendant providing the employment contract consistent with Defendant's 8/3/2020 written offer, (which Plaintiff asked Defendant for a status update and next steps on 8/14/2020, during their regularly scheduled Friday meeting and was told Defendant had been "too busy with accountants that week to send it out", and after which time Defendant provided no further update, the contract, or rescission).

79. In the alternative, Plaintiff proposed an altered job title and description and salary that would account for Defendant's material revision of Plaintiff's terms and conditions of employment.

80. Simultaneously Defendant, through employees Mr. and Mrs. Garman, increased scrutiny and criticism of Plaintiff's work.

81. Defendant refused to provide an employment contract in conformity with the written offer, citing Plaintiff's work had "dwindled."

82. Defendant refused to negotiate or redefine roles and informed Plaintiff he was restricting her access to certain corporate accounts, and offered Plaintiff August 26th off.

83. Three days after her initial, written complaint, alleging discrimination, unequal pay, retaliation, and a hostile work environment to Defendant, on August 27, 2020, Defendant terminated Plaintiff, removing Ms. Kinney and naming Patrick Garman CEO, by corporate resolution.

84. Upon information and belief, Defendant continues to retaliate against Plaintiff by contacting Plaintiff's friends, legal clients, mutual friends and business associates, alleging poor performance and making other disparaging remarks that injure Plaintiff's professional reputation and may preclude Plaintiff from securing employment.

85. In opposing the discriminatory behavior, Plaintiff had a good faith, reasonable belief that she had been or was being subjected to unlawful discrimination on the basis of gender.

86. Plaintiff's actions are causally connected to her protected activity.

87. As a proximate result of the Defendant's unlawful retaliation, through its employees and/or agents, Plaintiff has suffered damages including but not limited and was deprived of

job-related economic benefits, all in amounts to be established at trial, but in no event less than One Hundred Thousand Dollars ($100,000.00) including loss of earnings, emotional distress, dignitary injury, and other injuries as a direct result of Defendant's violations of the EPA.

## COUNT III
## BREACH OF CONTRACT

88. Pursuant to 28 USC 1367(a), this Court has supplemental jurisdiction over all state claims which arise out of a common nucleus of operative fact with a substantial federal claim. See Geter v. Galardi S. Enterprises, Inc., 43 F. Supp. 3d 1322, 1329 (S.D. Fla. 2014) (quoting Lucero v. Trosch, 121 F.3d 591, 597 (11th Cir.1997)).

89. Plaintiff adopts and incorporates by reference the allegations in paragraphs 1 to 87 of this Complaint.

90. Defendant knew Plaintiff was interviewing elsewhere and did not want her to leave.

91. Defendant assigned a junior developer, with no Elementor experience, to learn to work with the program by getting a minimum viable product up on Plaintiff's website, prior to CEO negotiations, in February 2020.

92. Defendant's work had errors and Plaintiff's website still required significant work in order to be competitive in the legal forms delivery space, when the parties were negotiating Plaintiff's CEO compensation.

93. Plaintiff had phase 1 of the project scoped by another agency and the quote was $25,000.00 (not including Patrick Garman's expertise Defendant's custom software solution for form delivery) and was shared with the Defendant in February, prior to CEO compensation negotiations.

94. Plaintiff believed Defendant, specifically, Patrick Garman, had the skills, expertise, and interest to develop Plaintiff's project.

95. The promise of web development as compensation was extremely valuable to Plaintiff and the reason she was induced to accept a reduced base salary.

96. Prior to assuming the role of CEO, the Plaintiff and Defendant agreed to the title and compensation: 1) $130,000.00 base salary, 2) architecting and completing Plaintiff's eCommerce website, and 3) a performance bonus.

97. A major hosting company had expressed interest in partnering with Plaintiff's website, upon its completion.

98. Plaintiff began winding down her law practice in March, amidst a global pandemic, in reliance on the agreed CEO compensation.

99. Over the first 90 days Plaintiff performed; improving company culture, completing the corporate rebrand, increasing website sales leads, negotiating and implementing a new hiring platform, completing and publishing the employee handbook, set up sales pipeline, so much so that Defendant expanded her role on June 30, 2020, to include managing the Director of Engineering and Project Management.

100. Defendant failed to perform. While CTO, Patrick Garman, expressed his views on why Gravity Forms should not be installed, and expressed wanting to build a custom solution, no actual time was invested architecting a solution or actually performing any meaningful development or project management work on Plaintiff's website.

101. The same error existed, after Plaintiff was terminated by Defendant, on September 14, 2020.

102. Understanding there would be no way to compel Defendant's performance or quality for web development as compensation, Plaintiff attempted to negotiate fair

compensation with Defendant, asking for back pay, for her first 90 days where she received a reduced salary and no web development and no performance bonus.

103. Defendant's written offer stated the average salary for a CEO of a similar sized and aged company (not including education or experience) was $157,000.00 or $27,000.00 higher than Defendant paid Plaintiff, but Defendant refused to pay back pay, and said the salary increase would start when the employment contract was signed.

104. Plaintiff continued to rely on Defendant's words and actions, to her detriment.

105. On August 14, 2020, Patrick Garman stated: "he had been too busy with accountants that week" when Plaintiff asked for a status update on the employment contract.

106. Plaintiff continued to perform, and it was only after Plaintiff's written demand for an employment contract on August 24, 2020 that Defendant stated its intention to not provide one when Mr. Garman stated he was not "willing to extend the offer at that time."

107. Upon reason and belief, Defendant never, at any time, started the process of drafting an employment contract consistent with its stated intention and intimations to the contrary, pursuant to either the terms of the Parties initial agreement or Defendant's August 3, 2020 written offer.

108. Defendant's actions and inactions have damaged Plaintiff in an amount to be determined at trial, but in no event less than One Hundred Thousand ($100,000.00) Dollars, plus interest and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Honorable Court enter judgment as follows:

a. On Count I, enter declaratory judgment pursuant to 28 U.S.C. § 2201(a) that Defendant violated 29 U.S.C. §§ 206(d), 215(a)(2) when it discriminated against Plaintiff by paying her a base salary less than the base salary it pays male employees for a job that require substantially equal skill, effort, and responsibility, and are performed under similar working conditions;

b.   On Count I, enter declaratory judgment pursuant to 28 U.S.C. § 2201(a) that Defendant's violation of 29 U.S.C. §§ 206(d), 215(a)(2) was willful.

c.   On Count I, enter declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the Defendant's acts or omissions giving rise to its violation of 29 U.S.C. §§ 206(d), 215(a)(2) were not in good faith nor did Defendant have reasonable grounds for believing that its acts or omissions were not a violation of the EPA/ Fair Labor Standards Act of 1938 (FLSA), as amended, 29 U.S.C. 201 *et seq*;

d.   On Count I, grant judgment requiring Defendant to pay Plaintiff back pay, and interest (from the date this action was filed) and an equal amount as liquidated damages, pursuant to 29 U.S.C. § 216 for its violation of 29 U.S.C. §§ 206(d), 215(a)(2);

e.   On Counts I and/or II, issue a permanent injunction, pursuant to 29 U.S.C. § 217, prohibiting Defendant, its board members, council members, administrators, officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from paying women less than men for jobs that require substantially equal skill, effort, and responsibility, and are performed under similar working conditions in violation of 29 U.S.C. §§ 206(d), 215(a)(2);

f.   On Counts I and/or II, issue a permanent injunction, pursuant to 29 U.S.C. § 217, prohibiting Defendant, its board members, council members, administrators, officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from continuing to retaliate against Plaintiff and disparaging violation of 29 U.S.C. §§ 206(d), 215(a)(2);

g. On Counts II and/or III, grant compensatory, nominal, punitive, and such other and further relief as this Court deems necessary and proper in the public interest; and;

h. As to all Counts, award Plaintiff reasonable attorney's fees, expert fees, and costs.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all issues so triable.

Dated: October 14th , 2020.                    Respectfully Submitted,

*/s/ Rian Kinney*
**Rian Kinney, Esq.**
Florida Bar No. 74370
E-mail: rian@kinneyfirm.com
*Pro Se, Attorney for Plaintiff*
29A South Federal Highway
Dania Beach, FL 33004
Telephone: (954) 599-5245

<u>*CERTIFICATE OF SERVICE*</u>

**I hereby certify** that on October 14, 2020 I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system and a true and correct copy of the foregoing was served on all parties of record on the Service List below.

*/s/ Rian Kinney*
Rian Kinney, Esq.

**SERVICE LIST**

Mindsize, LLC
LegalInc Corporate Services Inc.
651 N Broad St Suite 206
Middletown, De 19709
(512) 886-0880
Contact@mindsize.me